THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEAL EVAN PRICE | ) | |
| | ) | |
| *Plaintiff,* | ) | No. 25 C 791 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| | ) | |
| CITY OF CHICAGO | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Neal Evan Price brings this Second Amended Complaint ("SAC") against the City of Chicago (the "City") and Uber Technologies, Inc. ("Uber") alleging several federal and state law claims stemming from the deactivation of his Lyft and Uber accounts. The City moves to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 77). For the reasons below, the Court grants the City's Motion to Dismiss [77].

## BACKGROUND

The following facts are set forth in the Second Amended Complaint, except where noted, which the Court accepts as true for purposes of a motion to dismiss. *See Lax v. Mayorkas*, 20 F. 4th 1178, 1181 (7th Cir. 2021).

### I. The Transportation Network Provider Ordinance and Rules

Price's lawsuit concerns the City's Transportation Network Provider ("TNP") Ordinance—a city ordinance regulating rideshare companies and the drivers who work for them. Price held a transportation network chauffeur license ("chauffeur license") issued by the City, authorizing him to work as a rideshare driver for Uber and Lyft. (Dkt. 66 ¶ 11). As such, Price was

1

subject to the TNP Ordinance. (*Id.* ¶ 10). The TNP Ordinance establishes a licensing and regulatory framework for the rideshare industry. (Dkt. 66 ¶ 12); *see also* MCC § 9-115-020 *et seq*. Rideshare companies like Uber and Lyft, referred to as "TNP licensees" in the Ordinance, must obtain a TNP license to operate in Chicago. MCC § 9-115-020. TNP licensees can only hire drivers who have a valid chauffeur license. *Id.* § 9-115-050(a)(1). For a driver to be eligible for a chauffeur license, he must possess a valid driver's license; be at least 21 years old; successfully complete a network driver's training program; and have no convictions for specific, enumerated offenses. *Id.* § 9-115-150(b)(1)(i-iv). TNP licensees apply for a chauffeur license on a driver's behalf, attesting that the driver is eligible for a license under the TNP Ordinance and Illinois law. *Id.* § 9-115-150(b)(4). TNP licensees must also perform criminal background checks of chauffeur license applicants and obtain their driving records. *Id.* §§ 9-115-150(b)(4).

Upon receiving an attestation from a TNP licensee and "any other application information" the Commissioner of the Department of Business Affairs and Consumer Protection (the "Commissioner") deems appropriate, the Commissioner "shall issue" a chauffeur license to "each applicant that the Commissioner determines to be eligible for such a license." *Id.* § 9-115-150(b)(5). The same rules detailed above apply to applications to renew an existing chauffeur license. *Id.* § 9-115-150(a). The Commissioner may seek penalties against any TNP licensee or chauffeur license holder who violates the TNP ordinance, including but not limited to, fines, license suspension, license revocation, restitution, and other equitable relief. *Id.* § 9-115-220(b)(i-iv).

Rideshare companies and their drivers are also subject to the TNP Rules, promulgated by the Department of Business Affairs and Consumer Protection ("BACP"). *See* Chicago Business

Affairs and Consumer Protection, Transportation Network Providers Rules, Aug. 10, 2020[1]

(hereinafter "TNP Rules"). TNP Rule 1.10 covers notification of deactivated drivers. *See* Rule

TNP1.10. It requires rideshare companies to report driver deactivations for public safety concerns

to the City. (Dkt. 66 ¶ 13). TNP Rule 1.10 provides:

> I. TNP licensee must have in place a process to notify and report to the Department the name, associated driver's license number, associated vehicle identification number, and vehicle license plate of an affiliated transportation network driver permanently deactivated from the TNP's platform for conduct that gave rise to a public safety concern, including any of the following reasons:
>
>> 1. Criminal complaint or arrest;
>> 2. Criminal investigation;
>> 3. Allegation or complaint of sexual misconduct;
>> 4. Allegation or complaint of traffic accident or incident that resulted in a police report or insurance claim being filed;
>> 5. Allegation or complaint of use or possession of an illegal drug or substance;
>> 6. Allegation or complaint of driving under the influence of intoxicating beverages, drugs, or substances;
>> 7. Allegation or complaint of assault or battery;
>> 8. Unauthorized TNP driver account sharing;
>> 9. Use of fraudulent information or documents during TNP driver onboarding process, including, but not limited to, identify theft; or
>> 10. Conduct that gave rise to a public safety concern not itemized above in this section.
>
> II. TNP licensee must notify the Department within four business days of deactivating a driver for the reasons specified in this Rule. Licensees must identify their notification method in the process plan that they submit to the Department.
>
> III. TNP licensee shall submit its written notification plan during the license application process for issuance of a new or renewal TNP license. For TNP license renewal application, the TNP's written notification plan shall include TNP's review and audit of its compliance with this rule during past license term.

---

[1] The TNP Rules can be accessed at
https://www.chicago.gov/content/dam/city/depts/dol/rulesandregs/TNPRulesAmendedeff81020.pdf.

*Id*. TNP Rule 1.10 does not require TNP licensees to deactivate drivers in response to customer complaints or otherwise control how licensees handle deactivations. *Id.* Additionally, it has no requirements or prohibitions regarding communication between TNP licensees about driver deactivations. *Id.* Under TNP Rule 5.02, deactivation from a licensed TNP platform immediately suspends the driver's chauffeur license for that specific platform. (Dkt. 66 ¶ 14); *see also* Rule TNP5.02.

## II.  Price is Deactivated by Uber and Lyft

On January 7, 2025, Uber deactivated Price's account after a rider reported Price for "dangerous driving." (Dkt. 66 ¶ 15). Price claims that Uber did not investigate Price's account of the accident and the allegation was never "proven true." (*Id*. ¶ 16). Price was not found criminally or civilly liable for "dangerous driving." (*Id*. ¶ 18). Uber previously deactivated Price from its platform after Price was accused of getting into an accident and Price was later reactivated after challenging the allegation. (*Id.* ¶ 17).

On January 22, 2025, Lyft deactivated Price's account after it was notified of Price's Uber deactivation (*Id*. ¶ 20). Price received an email from Lyft regarding his deactivation, which states:

> Pursuant to the City of Chicago's Rule TNP 1.10, Lyft was notified that you have been deactivated by other Transportation Network Provider (TNP) due to conduct that gave rise to a public safety concern. As such you are also deactivated from the Lyft platform.
>
> Lyft and other ridesharing companies are TNPs. Lyft deactivated your account due to notification from another TNP of your deactivation on their platform.
>
> Lyft does not have information about the underlying incident. If you would like more information about the reported incident, we recommend you follow up with the TNP that deactivated your account on their platform.
>
> Next steps you can take: If you would like to be considered for reactivation on the Lyft platform, please contact the TNP that deactivated your account and request reactivation on their platform.

> Only the TNP that initially deactivated your account is able to resolve your account deactivation. Neither the City of Chicago nor the Department of Business Affairs and Consumer Protection can assist you.

(Ex. A, Dkt. 66). Price alleges that the City "shared and facilitated the sharing" of information about Price's deactivation from Uber with Lyft, which led to his Lyft deactivation. (Dkt. 66 ¶ 27). Price asserts the City did not notify him that it was sharing information with Lyft, provide him with an opportunity to contest the allegations, or investigate the allegations prior to sharing the information with Lyft. (*Id*. ¶¶ 29-31). Uber and Lyft's deactivations of Price's accounts apply nationwide. (*Id*. ¶ 34). Price contends that, because of the City's actions in sharing Uber's deactivation of Price with Lyft, his chauffeur license was automatically suspended pursuant to TNP Rule 5.02. After the deactivation of his Uber and Lyft accounts, Price lost his ability to earn a living as a rideshare driver. (*Id*. ¶ 35). In addition, Price's TNP license was revoked, allegedly without notice or hearing. (*Id*. ¶ 36).

### III. Procedural History

On January 28, 2025, Price sued the City alleging violations of his civil rights under 42 U.S.C. §§ 1983, 1985; antitrust violations under 15 U.S.C. § 2; and a state law claim for intentional infliction of emotional distress. (Dkt. 10). The Court dismissed Price's Original Complaint on June 25, 2025 for failure to state claims upon which relief could be granted. (Dkt. 41). On June 30, 2025, Price filed a First Amended Complaint reasserting the same claims that were previously dismissed, along with additional state law claims for defamation, tortious interference with business relationships, and negligence. (Dkt. 43). The Court dismissed Price's First Amended Complaint on October 28, 2025, again for failure to state claims. (Dkt. 64). On November 17, 2025, Price filed a Second Amended Complaint reasserting all nine of the same claims previously dismissed. (Dkt. 66). The City now moves to dismiss the SAC under Rule 12(b)(6). (Dkt. 77).

5

**LEGAL STANDARD**

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). Specifically, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). As such, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Further, the moving party bears the burden of establishing the insufficiency of the plaintiff's allegations.

**DISCUSSION**

Price brings nine claims against the City in his SAC: violationd of his procedural and substantive due process rights under 42 U.S.C. § 1983, a *Monell* claim, a conspiracy claim under 42 U.S.C. § 1985, an antitrust claim under Section 2 of the Sherman Antitrust Act, and four claims under Illinois law for intentional infliction of emotion distress, defamation, tortious interference with business relationships, and negligence. In dismissing both of Price's previous Complaints, the Court gave Price sufficient guidance as to the problems with his pleadings. Unfortunately, despite the addition of new facts and details, the SAC suffers from the same deficiencies as Price's previous attempts.

6

As a preliminary matter, Price filed a "Notice of Supplemental Evidence" after briefing on the City's Motion to Dismiss was complete. (Dkt. 105). In this Notice, Price asks the Court to consider newly obtained evidence from Lyft. (*Id.* at 1). The evidence consists of documents provided from Lyft indicating that it received a notification from the BACP that Price had been deactivated on January 9, 2025. (Ex. B, Dkt. 105 at 13-14). In its cover email to Price, Lyft stated that it received this "Rule TNP 1.10 Notification of Deactivated Drivers" from the City, not Uber. (Ex. A, Dkt. 105 at 5). Price argues that this evidence is relevant to the Court's evaluation of the City's involvement in the events underlying his claims. (Dkt. 105 at 1). Relevant or not, Courts generally may not consider evidence outside of a complaint in deciding a 12(b)(6) motion to dismiss. *See United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*, 44 F.4th 646, 662 (7th Cir. 2022) ("[A] ruling on a motion to dismiss considers only the pleadings[.]"); *Austin v. Cook Cnty.*, 2022 WL 4386685, at *2 (N.D. Ill. Sept. 22, 2022); *Consolino v. Dart*, 2023 WL 6141311, at *10 (N.D. Ill. Sept. 20, 2023). The proper course of action for Price to take would be to seek leave to file an amended complaint adding new allegations based on this evidence. *See Dart*, 2023 WL 6141311, at *10. Nonetheless, because this evidence does not change the Court's conclusions, and to avoid the need for further amendment, the Court will consider it in its analysis.

## I. Procedural Due Process Claim

In Count I of his SAC, Price asserts a procedural due process claim, alleging that the City facilitated the sharing of unverified allegations between rideshare companies resulting in his nationwide deactivation from Lyft, which deprived him of protected property interests without procedural protections. (Dkt. 66 ¶¶ 46-56). The Fourteenth Amendment protects against the deprivation of a protected interest without due process of law. U.S. Const. amend. XVI. To plead a due process claim, "a plaintiff must allege the 'deprivation of a protected interest' and

'insufficient procedural protections surrounding that deprivation.'" *Martin v. Haling*, 94 F.4th 667, 671 (7th Cir. 2024) (internal citations omitted). The Court dismissed Price's procedural due process claim in the previous Complaints because Price failed to identify or establish any constitutionally protected property interest. (Dkt. 41 at 6); (Dkt. 64 at 7). The City argues that Price failed to do so again. (Dkt. 77 at 7).

Price must first establish a constitutionally protected property interest to properly state a procedural due process claim. *See Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 694 (7th Cir. 2013) ("The threshold question in any due process challenge is whether a protected property or liberty interest actually exists."). "'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 592 (7th Cir. 2021) (citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)). Entitlements are not created by the Constitution; instead, they are "defined by existing rules or understandings that stem from an independent source such as state law." *See id.; Bell v. Cty. Of Cntry. Club Hills*, 841 F.3d 713, 717 (7th Cir. 2016) (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

First, Price asserts that he has a property interest in his employment as a ride share driver. (*Id.*). Price relies on *Bordelon v. Chicago School Reform Bd. Of Trustees,* a case involving a public employee—a school principle—who lost his job. 233 F.3d 524 at 531 (7th Cir. 2000). Unlike Price, a public employee may have a constitutionally protected property interest in his state employment. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 539 (1985). Additionally, as this Court has explained twice, the City could not have deprived him of any property interest in his employment because the rideshare companies, not the City, were Price's employers. *See Palka v.*

8

*Shelton*, 623 F.3d 447, 452 (7th Cir. 2010) (holding that "[b]ecause the County, not the City, was Palka's employer, Palka cannot sue the City and its employees for depriving him of due process in connection with the loss of his employment."). As such, Price does not have a protected property interest in his ability to work as a rideshare driver.

Price then asks the Court to recognize his TNP license as a constitutionally protected property interest. (Dkt. 66 ¶ 47). To have a legitimate claim of entitlement to a government-issued benefit, like a license, a plaintiff must show that an ordinance "provides substantive criteria which, if met, dictate the issuance of the license or permit." *Mary Jane Sweet Spot, LLC v. City of Blue Island*, 2024 WL 1363635, at *6 (N.D. Ill. Mar. 29, 2024) (citing *New Burnham Prairie Homes, Inc. v. Vill. of Burnham*, 910 F.2d 1474, 1480 (7th Cir. 1990)). If the claimed injury is the revocation or non-renewal of a license, the plaintiff must point to a source of law that creates a "system of nondiscretionary rules governing revocation or renewal of that benefit." *Chicago United Indus., Ltd. v. City of Chicago*, 669 F.3d 847, 851 (7th Cir. 2012). Additionally, " a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *FKFJ, Inc.* at 592 (quoting *Town of Castle Rock*, 545 U.S. at 756).

Previously, this Court dismissed Price's claim because he failed to assert any allegations showing that the TNP Rules create a nondiscretionary system for awarding, revoking, or renewing TNP licenses. (Dkt. 64 at 7). This time, Price points to *Cohran v. City of Chicago*, 2026 WL 234217 (N.D. Ill. Jan. 29, 2026) (Hunt, J.), a recent decision from this district that considered a motion to dismiss on similar facts. (Ex. A, Dkt. 102). As explained below, this Court declines to follow the reasoning in *Cohran* with respect to protected property interests.

In *Cohran*, the plaintiff, a rideshare driver, sued the City for allegedly violating her due process and equal protection rights and tortiously interfering with her prospective business

9

relationship with a rideshare company. 2026 WL 234217 at *1. Similar to Price, Cohran alleged that she was deactivated by Uber based on allegations that she spit on a passenger. Subsequently, Lyft deactivated her after it was notified pursuant to TNP Rule 1.10 that she was deactivated by another TNP licensee for conduct that gave rise to a public safety concern. *Id.* at *2. The Court held that the plaintiff adequately stated a procedural due process claim, finding that the plaintiff had a constitutionally protected interest in her chauffeur license. *Id.* at *6-8. The Court reached this conclusion after citing this language in the TNP Ordinance: "the Commissioner shall issue a transportation network chauffeur license ... for a maximum of a one-year period." *Id.* at *5 (citing MCC § 9-115-150(b)(5)). From this language, the Court concluded that "the process to issue or renew a chauffeur license does not include any discretionary language that requires the Commissioner to assess circumstances such as the appropriateness and desirability of a location, whether there is an overconcentration of similar licenses, or the general welfare of the community." *Id.* at *5-6.

Yet, a more complete reading of the TNP Ordinance shows that there are key phrases granting the Commissioner discretionary power to determine which applicants are eligible to receive the chauffeur licenses. The TNP Ordinance first outlines the relevant criteria an applicant must satisfy to be eligible for a chauffeur license. MCC §§ 9-115-150(b)(1)(i-xii). Section 9-115-150(b)(5) goes on to state:

> After receiving: (i) the attestation provided pursuant to subsection (b)(4), and (ii) any other application information, *as the Commissioner deems appropriate*, the Commissioner shall issue a transportation network chauffeur license, in a form prescribed by the Commissioner, *to each applicant that the Commissioner determines to be eligible for such license*. Each transportation network chauffeur license shall be issued for a maximum of a one-year period.

§§ 9-115-150(b)(5) (emphasis added).

10

Reading this language as a whole, the TNP Ordinance grants the Commissioner the authority to request additional applicant information beyond the listed eligibility criteria. Then, the Ordinance grants the Commissioner the authority to determine which applicants are eligible for a chauffeur license. The language "as the Commissioner deems appropriate" and "to each applicant that the Commissioner determines to be eligible" indicates that there is "discretion vested in the [Commissioner] regarding the nature of the decision to be made in evaluating an application . . . ." *Bayview-Lofberg's, Inc. v. Milwaukee*, 905 F.2d 142, 146 (7th Cir. 1990) (affirming dismissal of due process claims and holding that plaintiffs did not have property interests in liquor licenses). Furthermore, there is no limit placed on the Commissioner's discretion to grant a chauffeur license. *Se Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) ("A property interest of constitutional magnitude exists only when the state's discretion is 'clearly limited' such that the plaintiff cannot be denied the interest 'unless specific conditions are met.'"); *Quick v. Illinois Dep't of Fin. & Pro. Regul.*, 468 F. Supp. 3d 1001, 1007 (N.D. Ill. 2020) (plaintiffs adequately alleged a property interest in a license where the law contained language mandating the issuance of licenses if there were qualified applicants). The TNP Ordinance "lodges discretion" in the Commissioner to impose additional criteria on applicants and "disapprove applicants he or she deems unsatisfactory," so Price does not have a protected property interest in the chauffeur license. *See Mary Jane Sweet Spot, LLC*, 2024 WL 1363635 at *8 (holding that plaintiffs did not have property interest in a business license).

Further, license renewal is not automatic; it requires another application subject to the same requirements as applications for issuance. MCC § 9-115-150(a). As such, Price possessed only a unilateral expectation to a chauffeur license because the TNP Ordinance explicitly grants the Commissioner the discretion to grant or renew licenses. *See FKFJ, Inc.*, 11 F.4th at 592 (there is

no property interest in a government license when the relevant law or ordinance "gives the [decisionmaker] authority to approve applications for renewals, rather than mandating that the [decisionmaker]approve and execute renewals when the requisite criteria is met."); *Mary Jane Sweet Spot*, 2024 WL 1363635 at *8 (no property interest in business license existed where relevant law did not stipulate that individuals were entitled to license renewal as a matter of course if they met certain undemanding criteria).

The provision of the TNP Rules regarding the automatic suspension of a chauffeur license is also relevant given Price's argument that he was deprived of his alleged property interest when he was deactivated from Lyft and Uber. (Dkt. 66 ¶¶ 50-51). If a driver is deactivated from a licensed TNP platform, their chauffeur license is immediately suspended. *See* Rule TNP5.02. First, the rideshare companies, not the City, deactivated Price's accounts. The City does not control if, when, or how a TNP licensee may deactivate a rideshare driver, it only dictates what happens after with respect to the driver's status with the City. Further, a license is only a property interest if it is revocable only for cause or there is a requirement for a pre-revocation notice or hearing. *Club Misty v. Laski*, 208 F.3d 615, 619 (7th Cir. 2000); *Frey Corp. v. City of Peoria, Ill.*, 735 F.3d 505, 512 (7th Cir. 2013). Applying this reasoning to the suspension of a license, there is no protected interest here. When a driver has been deactivated by a rideshare platform, the TNP Rules do not require a notice or a hearing before said driver's chauffeur license is suspended. *See* Cohran, 2026 WL 234217 at *7 (recognizing that the TNP Rules "create a statutory regime that functionally [revoke] a driver's chauffeur license without a hearing"). Additionally, because the suspension is automatic upon deactivation, there is inherently no for-cause requirement.

Further, according to TNP Rule 5.02, a chauffeur license is only valid if the driver "is affiliated, active, and is in good standing with the City of Chicago and the affiliated TNP licensee's

12

platform." *See* Rule TNP5.02. A property interest must be "securely and durably yours under state (or ... federal) law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." *Reed v. Vill. of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983), overruled on other grounds by *Brunson v. Murray*, 843 F.3d 698 (7th Cir. 2016). Since the validity of a chauffeur license depends on decisions by private companies, it is not the kind of secure and durable interest that is protected under the Fourteenth Amendment. *See Frey Corp.*, 735 F.3d at 511 (holing that when "a third party controls what happens to the property owner's site approval—and there is nothing secure or durable about an interest controlled by a third party.").

Price points to Supreme Court precedent holding that the Due Process Clause applies to the deprivation of a driver's license by the State. *Dixon v. Love*, 431 U.S. 105, 112 (1977). In doing so, Price appears to be asserting that a chauffeur license is equivalent to a state-issued driver's license. (Dkt. 87 at 9). Chauffeur licenses, which allow individuals to work as rideshare drivers, are more akin to business permits and licenses, which do not enjoy the same status as driver's licenses under the law and are subject to the type of analysis the Court engaged in above. *See, e.g.*, *Tranchita v. Callahan*, 511 F. Supp. 3d 850, 880 (N.D. Ill. 2021) (analyzing whether hound hunting license is a protected property interest under the Due Process Clause); *Mary Jane Sweet Spot, LLC*, 2024 WL 1363635 at *6-8 (same with respect to license to operate business). Accordingly, Price does not have a protected property interest in his ability to work as a rideshare driver or his TNP chauffeur license. Since Price does not allege any other facts from which this Court can infer the existence of any other property interests, his procedural due process claim once again fails and is dismissed.

## II. Substantive Due Process Claim

Price also argues that the City violated his substantive due process rights when it shared unverified allegations with rideshare companies resulting in his nationwide deactivation from rideshare platforms. (Dkt. 66 ¶¶ 57-64). The substantive due process component of the Fourteenth Amendment's Due Process Clause protects individuals from arbitrary action by the government. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). To state a substantiative due process claim, a plaintiff must allege that the government violated a fundamental right or liberty, and that the violation was arbitrary and irrational. *Campos v. Cook County*, 932 F.3d 972, 975 (7th Cir. 2019). If a right does not qualify as fundamental, then the government action need only bear a rational relationship to a legitimate governmental interest; put differently, the action must be "neither arbitrary nor irrational." *Gen. Auto Serv. Station v. City of Chi.*, 526 F.3d 991, 1000 (7th Cir. 2008). The City argues that Price's substantive due process claim must be dismissed because Price once again fails to assert a fundamental right. (Dkt. 77 at 6-7).

In examining Price's prior Complaints, the Court twice held that Price's asserted right to his employment was not fundamental. (Dkt. 41 at 7-8); (Dkt. 64 at 7-9). Despite this, Price once again claims that he has a right to "pursue his chosen occupation as a rideshare driver." (Dkt. 66 at ¶ 59). The Court reiterates once again that "employment-related rights are not fundamental." *Campos*, 932 F.3d at 975 (cleaned up). While the right to occupational liberty is protected by the Due Process Clause, it only encompasses the "liberty to follow a trade, profession, or other calling.". *Hinkle v. White*, 793 F.3d 764, 767 (7th Cir. 2015). This right, does not, however, include the right to a particular job. *Id; see also Fei Wang v. Bd. of Trs. of Univ. of Illinois*, 612 F. Supp. 3d 739, 751 (N.D. Ill. 2020) (citing *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992) and *Roth*, 408 U.S. at 575). Price does not have a fundamental right to the particular job of rideshare driver. Furthermore, he is free to pursue other opportunities, such as working as a taxi

14

driver. *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (An individual's occupational liberty may be violated only when the state "imposes a stigma or other disability on the individual which forecloses other opportunities.").

Price also once again alleges he has a fundamental right to possess his TNP license, (Dkt. 66 at ¶ 59), but this does not save Price's claim. Maintaining a license to operate as a rideshare driver is not among the liberty rights considered fundamental. *See Sung Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 832 (7th Cir. 2012) (noting that the list of fundamental rights is includes "things like the right to marry, the right to have children, the right to marital privacy, the right to contraception, and the right to bodily integrity."). This Court does not consider maintaining a TNP license to be "so deeply rooted and sacrosanct that no amount of process would justify its deprivation." *Christensen v. Cnty. of Boone, IL*, 483 F.3d 454, 462 (7th Cir. 2007). Because the right to employment and the right to possess a TNP license are not fundamental, rational basis review applies. As this Court previously found, TNP Rule 1.10 survives rational basis review. (Dkt. 41 at 8, Dk. 64 at 9); *see also Cohran*, 2026 WL 234217 at *11 (holding that TNP Rule 1.10 "easily survive rational basis review" because it bears a rational relationship to maintaining public safety on roads). Price has not plead anything in his SAC that changes this conclusion.

Price's substantive due process claim still fails even considering his asserted interest in his TNP license as a property interest. Substantive due process claims "involving only the deprivation of a property interest are cognizable where the plaintiff shows 'either the inadequacy of state law remedies or an independent constitutional violation.'" *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 943 (7th Cir. 2010) (quoting *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003). As discussed above and below, Price failed to plead a protected property interest in his TNP license or an independent constitutional violation. Additionally, Price still does not

argue that he does not have an adequate state law remedy. Accordingly, Price again fails to plead a substantive due process claim, so the claim must be dismissed.

### III.  *Monell* **Claim**

Next, Price asserts a *Monell* claim against the City, arguing that TNP Rule 1.10 is an official City policy which caused him to lose his ability to work as a driver nationwide. (Dkt. 66 at ¶¶ 65-72). To prevail on a *Monell* claim, a plaintiff must show that a municipal policy or custom caused a constitutional injury. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 672 (7th Cir. 2022) (citing *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 691, 694 (1978). Under *Monell*, a municipality may be liable for money damages under § 1983 "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690). The policy or practice must be the "moving force behind the" constitutional violation. *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023). The City argues that Price's *Monell* claim fails because he fails to point to a City policy that caused his injury. (Dkt. 77 at 5-6).

To start, Price has not plausibly alleged that he has suffered a constitutional violation. *See supra* Secs. I-II. Even assuming he had, Price does not meet the *Monell* pleading requirements. This Court dismissed the *Monell* claim in Price's First Amended Complaint because Price failed to allege the existence of a City policy requiring the sharing of information with TNP licensees. (Dkt 64 at 10). Price makes the same allegations and arguments again, with the addition of facts showing that the City, not Uber, shared information about Price's Uber deactivation with Lyft. This fact does not save Price's SAC.

16

Even if the City informed Lyft of Price's deactivation from Uber, there are no facts suggesting that this action was taken pursuant to any explicit or implicit policy or custom. TNP Rule 1.10 only requires TNP licensees to notify the City after deactivating a driver. *See* Rule TNP1.10. Price does not point to any TNP Rule or other express policy that requires the City to share information about driver deactivations with TNP licensees. Price also fails to allege the existence of a widespread custom or practice of sharing driver deactivation information with TNP licensees. To proceed under this theory of *Monell* liability, Price must allege facts that permit the reasonable inference that the practice is, in fact, "widespread and the specific violations complained of were not isolated incidents." *Thomas*, 74 F.4th at 524 (citing *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017)). Allegations of "a few sporadic examples of an improper behavior" will not suffice. *Thomas,* 74 F.4th at 524 (concluding that allegations of two isolated incidents failed to plausibly allege widespread practice) (citing *See Flores v. City of South Bend*, 997 F.3d 725, 733 (7th Cir. 2021)). Price only references two isolated incidents of the alleged "illegal" information sharing—what happened to him and what happened to the plaintiff in *Cohran*. As such, Price cannot maintain *Monell* claims against the City based upon the first two theories of *Monell* liability.

Price's claim also fails under the third theory of *Monell* liability because Price fails to allege that his injuries were caused by the act of an official with "final policy making authority." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). Even if Price could proceed under any of these theories, his *Monell* claim would still fail because he only alleges but-for causation, which this Court previously held was not enough. (Dkt. 41 at 5-6); (Dkt. 64 at 10). Liberally construing Price's SAC, the causation he alleges is no different than that of his First Amended Complaint. He alleges once again: the City passed the TNP Rules, which require

rideshare companies to report to the City if a driver is deactivated for conduct that gave rise to a public safety concern; without this policy, Uber would not have reported Price's deactivation to the City; and, if Uber did not report the deactivation, neither Uber nor the City would have notified Lyft, which would not have deactivated Price's account. (Dkt. 66 ¶¶ 66-71). Price's reasoning still "amounts only to a showing of but-for causation, which does not suffice under Monell." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019) (City of Chicago was not liable under *Monell* where plaintiff only demonstrated but-for but not actual causation). Price's assertions that the City's policy was the "moving force" and direct cause of his injury are mere recitals of the elements of a Monell claim that do not cure his pleading deficiencies. (Dkt. 66 ¶¶ 69-70).

In sum, no City policy requires TNP licensees to take any action in response to notification that another licensee deactivated a driver, and Price does not plead otherwise. Price acknowledges that the City cannot be liable for the independent business decisions of Uber and Lyft. (Dkt. 87 at 1). The Court reiterates that any issues Price has with the rideshare companies' decisions to deactivate him must be taken up with them, not the City. Price's *Monell* claim is dismissed.

**IV.  Conspiracy Claim**

In Count IV of the SAC, Price asserts that the City conspired with rideshare companies through its implementation of TNP Rule 1.10 to deprive him and "a class of drivers" of their "due process rights" in violation of 42 U.S.C. § 1985. (Dkt. 66 ¶ 75). Section 1985(3) "provides a cause of action for persons who are victims of a conspiracy to deprive them of the 'equal protection of the laws' or 'equal privileges and immunities under the laws.'" *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 827 (7th Cir. 2022). A plaintiff bringing a § 1985 claim must plead:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and

18

> (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Id.* Additionally, the plaintiff must allege that the conspiracy targeted a specific race or class, resulting in an equal protections violation. *See Katz-Crank v. Haskett*, 843 F.3d 641, 650 (7th Cir. 2016) (holding that to state a claim under § 1985(3), "racial or class-based animus" is required); *Gunawardana v. Am. Veterinary Med. Ass'n*, 2021 WL 4951697, at *3 (7th Cir. Oct. 25, 2021) (affirming dismissal § 1985(3) claim because "[g]raduates of foreign veterinary schools are not a protected class cognizable based on race or national origin.").

Price's previous attempts at bringing a § 1985(3) claim failed because he did not allege a conspiracy with a racial or class-based animus. (Dkt. 41 at 9); (Dkt. 64 at 11-13). Price's new allegation that the City's supposed conspiracy targeted "a class of drivers" still does not suffice to state a claim. (Dkt. 66 ¶¶ 75, 81). Rideshare drivers are not a suspect class afforded protection under § 1985(3). *Grimes v. Smith*, 776 F.2d 1359, 1365 (7th Cir. 1985) (holding that § 1985(3) does not reach conspiracies motivated by economic or commercial concerns) (citing *United Bhd. of Carpenters & Joiners of Am. Local 610 v. Scott*, 463 U.S. 825, 837-38 (1983)). Further, Price does not specify which "[m]inority groups" are "possibly" included in the class of rideshare drivers, nor does he allege he is a part of any of those groups. (Dkt. 66 ¶ 81). There are no other facts alleged in the SAC that suggest discriminatory animus on the basis of a race or a protected class. *See Milchtein*, 42 F.4th at 828 (religious classifications likely qualify for protection under Section 1985(3); *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1486 (7th Cir. 1985) ("race, ethnic origin, sex, religion and political loyalty that have previously been recognized as possibly supporting a Section 1985(3) claim"). Accordingly, Price's pleadings again fail to meet the requisite standard to survive a motion to dismiss. *Chen v. Yellen*, 2022 WL 2818709, at *7 (N.D.

19

Ill. July 19, 2022) (dismissing § 1985(3) claim because plaintiff "failed to allege class-based animus."). Price's § 1985(3) claim is dismissed.

### V.       Antitrust Claim

Next, Price alleges that TNP Rule 1.10 violates Section 2 of the Sherman Act because it "facilitates an unlawful monopoly." (Dkt. 66 at ¶ 84). Section 2 of the Sherman Act imposes liability on "[e]very person who shall monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. To state a claim under Section 2 of the Sherman Act, Price must allege that the City "(1) possesses 'monopoly power in the relevant market' and (2) engages in 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020) (quoting *Verizon Communications, Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004)) (citations omitted). The City argues that dismissal is appropriate because Price fails to plead sufficient facts showing that the City has monopoly power. (Dkt. 77 at 9-10).

A plaintiff must prove the existence of a relevant commercial market before a court can evaluate whether he or she has stated a claim under Section 2 of the Sherman Act. *See Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, 2024 WL 2785142, at *6 (N.D. Ill. May 30, 2024) (citing *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012). Price sufficiently establishes that the relevant market is "rideshare services within the City of Chicago". (Dkt. 66 at ¶89). *See Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, 381 F.3d 717, 738 (7th Cir. 2004) (A relevant market has "both a product and a geographic dimension.").

Despite this, Price again does not meet the requisite standard to state a claim under Section 2 of the Sherman Act because the facts set forth in the SAC are insufficient to permit an inference

that the City had any power in the relevant market to create a monopoly. *See Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 901–02 (N.D. Ill. 2009) ("Dismissal is proper where the antitrust plaintiff fails to identify any facts from which the court can infer that defendants had sufficient market power to have been able to create a monopoly."). Monopoly power is the power to control prices or exclude competition. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Price still does not allege how the City's regulation of Uber and Lyft gives the City power to control prices or exclude competition. Price states that the City "facilitates" a monopoly by allowing companies to share driver data and exclude drivers from the market. (Dkt. 66 at ¶ 84). He also asserts that TNP Rule 1.10 allows established rideshare companies to "control the driver pool" and "creates a barrier to entry" for new companies. (*Id.* at ¶ 95). This Court has previously stated these allegations, even if true, do not assert that the City controls rideshare prices or manipulates competition among drivers or companies through its TNP Rules. (Dkt. 64 at 12).

At most, Price alleges that the rideshare companies, not the City, are engaging in anticompetitive behavior by sharing driver data and excluding or deactivating drivers. In fact, Price added numerous allegations that reference Uber's conduct but fails to allege new facts to establish the City possesses the power to control prices or exclude competition. Once again, Price's grievances are with the rideshare companies, not the City. Accordingly, Price's antitrust claim is dismissed.

Price has been given three tries to adequately allege federal law claims against the City but has not been able to meet the pleading standards under Rule 12(b)(6). Accordingly, Counts I-V are dismissed with prejudice.

21

## VI.     State Law Claims

Price's remaining claims are state law claims: intentional infliction of emotional distress, defamation, tortious interference with business relationships, and negligence. Because Price fails to state a federal law claim, the Court declines to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(c)(3). *See Doe-2 v. McLean County Unit Dist. No. 5 Bd. of Dirs.,* 593 F.3d 507, 513 (7th Cir. 2010) ("Ordinarily, when a district court dismisses the federal claim conferring original jurisdiction before trial, it relinquishes supplemental jurisdiction over any state-law claims under 28 U.S.C. § 1367(c)(3)."). Price's state law claims (Counts VI-IX) are dismissed without prejudice; Price is free to bring them in state court. *See Jackson v. City of Joliet*, 2025 WL 1940386, at \*22 (N.D. Ill. July 15, 2025); *Home Builders Ass'n of Greater Chicago v. City of Chicago*, 213 F. Supp. 3d 1019, 1033 (N.D. Ill. 2016).

**<u>CONCLUSION</u>**

For the reasons set forth above, the City's Motion to Dismiss [77] is granted. Counts I-V of Price's Second Amendment Complaint [66] are dismissed with prejudice. All remaining counts are dismissed without prejudice.

_____
Virginia M. Kendall
United States District Judge

Date: March 6, 2026

23